Idaho Rivers United v. FEDERAL ENERGY REGULATORY COMMISSION FISH WILDLIFE SERVICE 0572513 Good morning, your honors. Sarah Eddy for Idaho Rivers United and American Rivers. I'd like to reserve five minutes for rebuttal. All right, I'll remind you. Today I'd like to discuss three points of error addressed in our brief. The first being FERC's skewed cost-benefit analysis that it relied on in its environmental impact statement. Secondly, FERC's deferral of consideration of sturgeon mitigation in its license orders. And thirdly, Fish and Wildlife Service's issuance of a placeholder biological opinion. I have to, and I'll let you do that, but since I already said it's my time, I do have something that I want to ask you in terms of one of the things that FERC brought up had to do with standing under 10-J in their red brief. And in your gray brief, you didn't say anything about that. Are you conceding that issue? What's your position on that? We felt we were addressing the standing issue in our response brief. But no, Your Honor, we don't concede that we lack standing on the 10-J issue. There's nothing in the Federal Power Act limiting the standing of conservation groups to appeal a failure to comply with a 10-J recommendation. Can you point me to a case that answers that question? You know, I don't know of any cases that address that very specific question. So you think you have standing and they think you don't, and there's no cases? Is that? I do not know of any cases specifically addressing that question of 10-J conditions, although I will point to the Court to — I'm sorry, I'm blanking on the case at the moment. I'll find it for you. But there is a case involving — American Rivers was appealing Section 18, FERC's dealing with Section 18 fishway prescriptions, which that's — Fish and Wildlife Service and NIMS have the authority to require fishway conditions and a license. And this Court did uphold American Rivers' standing to challenge FERC's compliance with that Section 18 prescription. But there wasn't a 10 — but I don't think they said that — did they make the same — did FERC say that you didn't have standing under 10-J on American Rivers? No, that didn't have to do with a 10-J condition. It had to do with a Section 18 condition. So it doesn't — I'm trying — Yeah, so it doesn't really exactly answer it. Are you challenging — but the other thing is I didn't know whether — you know, obviously there are things that come out of that area that you might be arguing to say, well, this is more evidence of why it's arbitrary and capricious. But if you're actually making a 10-J challenge, are you doing what FERC says you're doing? In their red brief, what they said, you do not have standing to do what you're doing under — to make a 10-J essentially challenge. And are you doing what they said you're doing? I think that the specific question I believe that FERC was trying to address is, are questioning their failure to make proper findings or adopt the 10-J recommendations? And that's a fairly — that's a specific, narrow question at issue here. But there are many other issues that we've raised that don't address that very specific question. Well, I just found it unusual that you talk about everything else in your gray brief. It's pretty thick. But they raise the standing issue, and you just don't say anything. Well, you know, I apologize if you feel we didn't adequately address it. We felt like we were addressing it in the standing — our standing discussion generally, that we do have standing to challenge a FERC license order, including FERC's compliance with conditions issued by other federal agencies. Well, but I think they did make more than — but that was a different challenge that they were making. They made two challenges. Correct. On to judicious — however you say that. On to the judicious — I can't even say it now. I usually can say it, but I can't. But you understand what I'm saying, because I think that they — and, you know, while I think you did address it in terms of adding the affidavits and saying what the individual's injuries were, and you did all of that, but I didn't see anything addressing that. All right. The first issue I want to talk about is FERC's cost-benefit analysis, which Fish and Wildlife Service and Fish and Game, as well as my clients, had all urged that FERC require Idaho power to completely eliminate the practice of load following at three of these five projects, the Bliss, Lower Salmon Falls, and CG Strike projects. But FERC almost immediately rejected Fish and Wildlife and Idaho Fish and Game's recommendations to eliminate load following, based largely on its analysis of the costs and benefits of so-called run-of-river operations. And it used a similar cost-benefit analysis in its draft environmental impact statements and its final environmental impact statements. But the problem with this cost-benefit analysis is, first of all, in assessing how much it would cost Idaho power to lose generating capacity through run-of-river operations, FERC assumed that Idaho power would construct the most expensive generating facility out there, a so-called combined cycle combustion turbine, the most expensive kind of gas turbine. Yet in the — So, okay, but you have to show it's arbitrary and capricious, right? Correct. All right. So don't just tell me why you disagree with it. Tell me why it's arbitrary and capricious. It's arbitrary and capricious. Because that's a very high bar. Correct. It's arbitrary and capricious because the environmental impact statement itself said that, in fact, Idaho power had said it planned to meet any future generating shortfalls, not with a combined cycle combustion turbine, but with either purchases of power on the market, which is much less expensive, or a much less — or a slightly less expensive single cycle combustion turbine. That's the less expensive version of a gas turbine. So that's why it was arbitrary and capricious, because it directly contradicted its own record. And secondly, FERC further compounded this error in its analysis of how much generating capacity Idaho power would lose through run-of-river operations, and basically amounted to assuming that Idaho power would build the most expensive generating facility available to meet power shortfalls that would happen only one hour a day and only in one month of the summer, and only in seven out of 100 years. And the Department of Interior pointed out the unreasonableness of this analysis, yet FERC didn't adequately respond to this analysis. But furthermore, it's not simply a question of how FERC assessed the cost to Idaho power, which basically amounted to a worst-case scenario. And, you know, as far as the actual expense of that power loss, as I said, directly contradicted the record. But furthermore, on the benefits side, FERC completely failed to assess an important aspect of the benefits of run-of-river operations, the actual economic benefits to run-of-river operations, and underplayed the environmental benefits of run-of-river operations, despite the analysis of Fish and Wildlife and Fish and Game, that there would be vast environmental benefits. Now, you know, the economic benefits were a very important issue here, because Fish and Game had pointed out on the record that in 1996 alone, sport fishing was worth half a billion dollars in the state of Idaho. And Fish and Game, Fish and Wildlife, and my clients all urged FERC to assess the economic benefits. And we're not talking about placing a dollar value on environmental benefits. We're talking about very real economic benefits. We all urged FERC to consider those economic benefits in its cost-benefit analysis, yet FERC refused to do so, claiming that it would be purely speculative, despite the fact that there's many well-accepted methodologies for figuring out what economic benefits of recreation possibilities are. And, you know, FERC was speculating wildly in assessing the cost of Idaho Power, so it was simply a skewed, lopsided, and downright inaccurate cost-benefit analysis, which there's numerous cases from this circuit and other circuits, saying that FERC cannot rely on inaccurate economic information in its cost-benefit analysis, either inaccurate or misleading economic information, as well as that it must adequately consider benefits in doing a cost-benefit analysis. And this also violated FERC's obligation under the Federal Power Act to give equal consideration to power and non-power values, as well as its obligation here under the Northwest Power Act to give equitable treatment to fish and wildlife. And FERC further compounded those errors in this case. I'll talk about the second point of error I want to raise here, and it's deferral of sturgeon mitigation. Now, protection of sturgeon was one of the most important issues in this case. All the parties brought up this question of how these projects affect white sturgeon and the need to immediately provide protection for this species. Yet FERC completely deferred the question of how to protect sturgeon, saying that it would be. Okay.  Correct. And it's — is it your position under Yakima that FERC is barred from ever deferring its decision on what protection or mitigation measures are necessary for fish? What Yakima — I mean, it's one thing to defer thinking about it. It's another thing to defer assessing what the appropriate measures are. And I think if you sat here in the last case, we talked a little bit about that. And why isn't this just that they're deferring protection or mitigation measures of what's necessary for, you know, incremental dates in the future? Well, I would put it that in Yakima, this Court talked about that FERC is required to both consider and decide upon sturgeon — or in that case it didn't deal with sturgeon, but fish mitigation before issuing the license. And in fact — But what if more research would tell — would tell FERC what really is necessary? I mean, should they just make a decision based on not enough research? And wouldn't that be — then wouldn't you be arguing that's arbitrary and capricious because you haven't done enough research? Well, I would submit what would have been a more reasonable course, and in compliance with this Court's holding in Yakima, as well as the La Flame case and the California v. Federal Power Commission case, would be to do what we urged the commission to do, as well as Department of Interior and Fish and Game, which is to require — immediately require interim mitigation and then conduct further studies and figure out if any additional mitigation needed to occur or if they needed to change the terms of mitigation. But here, FERC did not require that interim mitigation and simply deferred the question to the future. And here, FERC justified — tried to justify that deferral by pointing out that the current license will maintain the status quo of sturgeon protection from the old license. But I would point out that that old license was issued almost 60 years ago, well before modern environmental laws were in place and well before sturgeon were in the state that they are now. Well, now, they have filed a sturgeon protection plan now. Is that correct? Correct. And just last week — Does that affect your argument at all? Not at all, Your Honor, because this Court's holding in Yakima was that by deferring important decisions about fisheries mitigation to the future, FERC prevents a holistic review of the license to determine whether the license is in the public interest. And that issue remains here despite the fact that they've approved the sturgeon plan. And furthermore, the Court found that FERC's discretion is considerably more limited in a so-called re-opener, provided a license amendment process than in original licensing. And here, FERC's discretion was even more limited because I might add that here, FERC approved the sturgeon plan without amending the license and without going through any sort of public process, not doing any new NEPA process, because they've effectively limited public involvement in this very important question of how to protect sturgeon. And I might also add, for purposes of their NEPA analysis, NEPA requires FERC to carefully consider the environmental impacts of its decisions, but it's hard for them to do that when they don't know what their decision is going to look like, when they don't have a mitigation plan crafted yet for white sturgeon. And I would point out that, you know, FERC talks a lot about the snail settlement and how the snail settlement provided some operations changes at two of the projects, Bliss and Lower Salmon Falls, for purposes of studying snails. So if I'm understanding your position correctly, when there isn't enough information for FERC to come up with a definite mitigation, the way that they get around that is they accept the plan that you propose in the interim, and then they get to modify it? No, I wouldn't say necessarily they would have to follow that approach. I would say they should do what they did, like I said, in the flame case and the Department of Interior case out of the D.C. Circuit, which was require some interim mitigation. Obviously, we'd like to see it be the mitigation we recommended, but, you know, I don't know that it would necessarily have to be that. But there needs to be some mitigation, and here they completely failed to do that. So it took no steps to ensure protection of sturgeon, despite the mandate in the Federal Power Act that each license must include mitigation protection and enhancement measures for fish and wildlife. And getting back to my previous point, that there are some moderate operations changes at the Bliss and Lower Salmon Falls projects to deal with the snail studies, but there's no operations changes at the CJ Strike project. You know, the operational requirements that FERC talks about in the license for CJ Strike are actually, as FERC points out in the EIS, just the maintenance of the status quo that's been in place in the project for the last 15 or 20 years, just the codification of operations that Idaho Power is already doing. So these are operations that are already part of the problem with sturgeon. So at CJ Strike project, there is no aquatic environmental mitigation required at all in the license. There's some terrestrial mitigation required, and there's fish stocking for recreational purposes. But there is nothing in the current CJ Strike project license to protect sturgeon. You know, apparently last week, FERC has adopted the white sturgeon mitigation plan, which I point out mostly consists of further studies to be conducted. If you want to save the balance of your time. Let me just very quickly address the biological opinion here, since I'm running out of time. It's your time, so go ahead. Now, since there's five species of snails listed under the ESA, the right issue in this case. Since these snails were first proposed for listing in 1990, Fish and Wildlife Service has consistently said that Idaho Power's dams, and specifically the practice of load following, are one of the most significant factors in the decline of those snails. And Fish and Wildlife Service consistently held this position throughout this process for, you know, 12 or 14 years. And even issued draft jeopardy biological opinions, finding that the projects would jeopardize three of these five species. Yet Idaho Power disagreed with those conclusions. And as a result, Fish and Wildlife entered into a closed-door settlement that my clients and no other parties were allowed to be a part of, where they agreed to these studies. And as a result, you know, the approach that basically came out of this was, it amounted to Fish and Wildlife thinks that the projects jeopardize the species, but since Idaho Power disagrees, they'll agree to issue this no jeopardy biological opinion for the first five years, and they'll do some studies, and then they'll figure out if the projects really do jeopardize the species. But this is exactly the kind of approach which Congress sought to prevent when it required that agencies, that Fish and Wildlife Service, issue a biological opinion on the best currently available information and give the benefit of the doubt to the species. And furthermore, it runs afoul of this Court's holding in Connor v. Burford, which found that Fish and Wildlife may not segment proposed federal actions for purposes of ESA consultation. It must consult on the full scope of the action, even where there is inadequate information to fully determine project impacts. They must make the best decision they can based on the currently available information. And here, Fish and Wildlife Service failed to do that. And I will reserve my last three minutes. Good morning, Your Honors. I'm Beth Pestella. I'm here for FERC, and with me again for you is David Shilton. This time he'll be speaking for the Fish and Wildlife Service for seven minutes. I'll have 13 minutes. All right. Let me ask you, let me just ask you this starting out. My understanding is you basically made two challenges, the Article III challenge on standing, and then you made essentially a statutory standing argument? I didn't actually make it. It was Idaho Power that made the FPA 10J standing argument. I wish I had made it. I don't know if you know, but Idaho Power, in the orders, questioned whether Petitioners had standing to for a non-10J recommendation organization to be complaining about 10J requirements not being complied with. So FERC itself made that. I, however, was not smart enough to do so in my brief. Idaho Power did. I only made the general standing. What do you mean when you say FERC made it? Made it at what stage? In the orders. In the orders itself, FERC, and I wish I had the – I have 1,000 pages in the record to cite you to. I don't have that because, again, I hadn't raised that issue. I'm sorry I wasn't prepared to point that out to you. Just raise the question or say it? Yeah. FERC just said we question whether you even have standing to raise this. Exactly. What's your position on it today? I think they surely don't. I mean, it makes sense to me now, now that I'm thinking about it more, that they don't have standing. Just because they're not one of the parties, they can – Yeah, they're not their recommendations, and so they're not their recommendations to complain about. It's very different from a Section 18 prescription where – and, again, I'm not sure of the facts in the cases that Petitioner Counsel cited to regarding Section 18, but my guess is that the wildlife agency, the resource agency, was party to that case as well as a petitioner. The problem is there are not any cases out there, which always makes me think that there's a reason for that. And the problem is that you're telling me now you should have made that argument. They didn't even respond to it. Right. And, you know, if it's not – if it's not already obvious, I wasn't an environmental lawyer in my past life. And so if – I mean, it's fairly important, and here, you know, we're looking at it with really what I would consider not really very good briefing on that particular issue. Well, let me tell you why that's not particularly important here, because there's another jurisdictional issue that I did raise, not standing, mootness. What is truly the alligator in the bathtub – sorry to use that once again today – is what Petitioners are really complaining about here is that FERC didn't put in FPA 10-J recommendations from these resource agencies that the resource agencies themselves do not want put in. They originally, at the beginning of the case, said we want to end all load following at these projects, at these five projects. Three of them had load following. Two were run-of-river. We want all run-of-river. And then Fish and Wildlife entered into a settlement with Idaho Power, and the result of that settlement was that there would be load following at CJ Strike for the full 30-year term of the license – and there's an unless to that, and I'll get to that – and that at Lower Salmon Falls and at Bliss Projects, there would be run-of-river for the entire periods, 30-year periods of the license, except for study purposes regarding the endangered snails, the listed snails. So the issues – all issues concerning the 10-J recommendations are moot. All issues concern – What about even with the CJ Strike? Moot thereto? It isn't thereto because they – originally, the agencies were recommending that there be load – no more load following, that there be run-of-river at CJ Strike. But now they're recommending that there be load following for the entire 30 years unless, after the snail studies, there are additional recommendations made by them and then there can be additional ESA consultation, additional filings, additional orders by FERC changing the license. It would require a license amendment. So it's funny to me that I'm even here arguing about this because this is done. FERC did spend some language talking, explaining why they might have rejected it anyway. But FERC didn't have those recommendations before it anymore. Fish and Wildlife and Idaho Fish and Game said to them, we want the following operations in these licenses for the full 30-year period, run-of-river at Lower Salmon Falls and Blitz. That's what the licenses require. Again, they said except for purposes of the snail studies. And snails are – There's no – there's no disagreement amongst the parties as to whether, you know, as part of their recommendation, they used a term, something like for the remaining period, means for the remaining period of the license as opposed to the remaining period of the experimental period? No. All of the briefs, and I can cite you to that, all of the briefs, obviously, my brief argues that throughout, if you look at Fish and Wildlife Services' brief at page 12, they say any change of project operation pursuant to the snail protection plan would require approval by FERC. Absent such a change, the Lower Salmon Falls and Blitz projects will continue to be operated in run-of-river mode. And the Idaho Power brief says at page 36, the agreement changed Idaho Power's proposal to continue to have load following at the Blitz and Lower Salmon Falls projects to one that would make those projects mostly ROR, except for two years of the study period. Although Idaho Power may propose changes in the licenses after the snail studies are complete, for now, the licenses issued for Blitz and Lower Salmon Falls contain a run-of-river condition that, unless subsequently modified, will be in effect for the 30-year term of the licenses. We're all in agreement on that. Petitioners are ignoring that fact. So all of the calculation complaint that they said the first thing they wanted to talk about was the cost-benefit analysis, that was regarding whether they would, whether FERC would impose run-of-river as the agencies were recommending. Well, that's gone. So I could talk about it and I could explain to you why FERC's cost-benefit analysis was correct anyway, but that issue is moot because it was, FERC did the cost-benefit analysis to determine whether it would adopt the recommendations to end load following. That's all that was about. So that's all gone. Also gone is any concern about fishways. And, Your Honor, you asked about what the FERC's approval of the White Sturgeon Conservation Plan means. Well, in the White Sturgeon, and we have not submitted it to the court yet, and we will do that in a 20HA letter, so you have a copy of the, because it just came out a couple of days ago, the commission's order. But in there, the order itself says at page 4 that due to significant uncertainty involving with passing White Sturgeon through engineered passage structures, which are fish passage, and the questionable benefits that may accrue and the high cost associated with that, Idaho Fish and Game no longer recommends that there be fish passage structures built at the project. So while originally they did want fish passage, Idaho Power no longer wants fish passage. So, again, that's another moot issue in this case. Now, who didn't want fish passage? Idaho Fish and Game originally wanted to. You said Idaho Power. I'm sorry. I meant Idaho Fish and Game. I was pretty sure that wasn't right. No, that certainly wasn't. So I'd be happy to talk about the merits of the cost-benefit analysis if you want me to, or I can move on to something else. Move on. Move on. And that also involves the non-power benefit calculation conservation law foundation case. And so I could talk about that if you want, but I won't otherwise. Let me talk about the deferral of sturgeon mitigation. First of all, there wasn't deferral of sturgeon mitigation, but let me start with my main point. Snails trump sturgeon because snails are endangered. They're listed species, and white sturgeon, thankfully, are not. So when Fish and Wildlife comes to FERC and says, we want you to do studies because we have to figure out what to do about these listed snails, FERC has no choice but to listen to that. We can't. And what they said was, we want you to do project operations, run a river, except at certain time periods for purposes of this study. We want you, we want you, FERC, to do load following at Lower Santa Falls and Bliss. And that's what FERC did, and FERC did it because snails trump white sturgeon. But the licenses do not defer sturgeon mitigation anyway. As the commission said, snails trump, but there are water quality changes that have been made in this license that are going to help sturgeon immediately. The state-imposed water quality certificate, those requirements did not exist before. They're there now, and that's automatically going to help the sturgeon. So there is immediate assistance for them. The commission also explicitly found that interim protection of the white sturgeon was unnecessary. And if you look at ‑‑ Well, what does Yakima require you to do? Yakima requires ‑‑ And how did you satisfy the requirements of Yakima? As Ron said before, Yakima requires consideration of the issues. And it's the ‑‑ I think the interior case in the D.C. Circuit, which is talking about, which has been, you know, spoken of approvingly by this court, where the court said, quote, Yakima does not require the commission to have perfect information before it acts, nor does it imply that all environmental concerns must definitively be resolved before the license is issued. So absolutely FERC has to think about these things. FERC did. FERC had two final environmental impact statements numbering the thousands of pages regarding these five licenses, these five projects. The ‑‑ FERC did all kinds of things for snails. It imposed ‑‑ there's minimum flows that didn't exist before. There's tremendous numbers of protections in these licenses now. There's minimum flows, reservoir drawdown limits that didn't exist before, tailwater ramping rate limits exist now that did not exist before. There's operational compliance monitoring, water temperature and dissolved oxygen monitoring, total dissolved gas monitoring, the White Sturgeon Conservation Plan, wetlands, construction, land management plans. I mean, I can go on and on. All of these things are explicit requirements of this license, and they are all there to protect fish and wildlife. Some things do require plans. As Your Honor was recognizing, you don't always know everything. What's the best thing to do? And if FERC doesn't impose ‑‑ if FERC doesn't issue a new license at this point, then what happens is there's just yearly licenses. And what those yearly licenses are, are the old thing. The old license continues to apply. So that certainly wouldn't have been better than what FERC did here. Let me ask you this. Based on their response in their brief, have they satisfied the Article III standing issue? It seems to me they have. I agree. I think for sure about the Lower Salmon Falls and Bliss projects, a little bit less for sure regarding C.J. Strike, but I'm not pushing that issue today. All right. Thank you very much. Thank you. May it please the Court, David Shultz. In this case, I'm representing the United States Fish and Wildlife Service, and I'll be discussing the biological opinion on the snails. The biological opinion did consider the entire term of the license. It didn't segment, as petitioners have alleged here. Can I ask you a question on the jeopardy issue? Is it unusual for fish and wildlife to change a jeopardy determination in a draft biological opinion to a no jeopardy determination in a final biological opinion, and what factors contribute to the change? Well, I don't know how. Because the implication was somewhat, although that this was a closed door, that I'm not sure that they had a right to be there anyway, but that a little untoward activity was the implication. That's the implication, but I don't think it's fair. The process of doing a biological opinion, it's not like a formal adjudicatory process such as FERC has. It's an informal scientific process, and it's certainly not uncommon for the applicant for the project to talk with the wildlife agency. After all, this is called consultation, and that's what it's all about, is sort of a back and forth about the science. And at a certain point in this case, you know, it became clear that there were kind of loggerheads, and what was absolutely clear was that we really didn't have much information about snails. I mean, if we're lacking information about salmon, we have even less about snails. We know that load following has some adverse effects, but we don't know how much, really, and we need to study that. So it made sense in this case to say, okay, let's do a study over this six-year study period. We are going to require the applicant to have run-of-the-river operation at the two dams that are most essential for protecting the snail recovery area, Lower Salmon Falls and Bliss, except for two years. Were you co-opted into abdicating your responsibility? No, no, I don't think so. This was simply a scientific question, and the applicant came to Fish and Wildlife with their studies, and it was evident that we needed to have a study period. We needed to get more information, and that it was reasonable to come to a settlement here, which will bring a lot of benefits. Changing Lower Salmon Falls and Bliss to predominantly run-of-the-river operation, which they will be except for two years of study, I think is very important, because that is where most of the important habitat is. Now, it's been mentioned that CJ Strike, under the settlement, can continue load following, but CJ Strike Reservoir, the furthest one downstream, only has a very small proportion, about 8% of the Idaho Springs snail recovery habitat, and none of the recovery habitat for the other listed species. Plus, CJ Strike is a large reservoir, which means that doing the load following there does not change the level of the reservoir very much, about a foot and a half, and that's not going to affect the snails very much, because they live up to a depth of seven feet. So, it seemed logical to come to this settlement where we allow what's been going, and these projects have been operating in load following mode, these three that I've mentioned, for a long time. The snails have survived. They obviously have some resilience to this. We do think there are some adverse effects, but the question here really is not, does load following have adverse effects? It's, does it cause jeopardy? And I think the Fish and Wildlife Service here reached a very rational conclusion that under the settlement agreement, that we're not going to have a jeopardy situation here. We won't for the Idaho Springs snail, because only a small percentage of its area is affected by load following. For the Bliss Rabbit snail, we won't, because actually most of its good habitat is not in the river. It's in springs and tributaries adjacent to the river. We won't for the FISA, because it is a deep-dwelling snail. Let's say it had been the other way. If a petitioner had come to you with information that maybe you hadn't quite considered, and initially you had said no jeopardy, but then you looked, I mean, is it just as likely that the petitioner can come to you and you say, oh, well, after it looked at that, I think that it is a jeopardy situation. Sure. Yes, absolutely. We would listen to anybody. In fact, we solicited peer review from scientists, and one of the peer review scientists was the very person who they relied upon in their affidavit for standing. So we do listen to all sides here. But I think it's important to stress that a draft biological opinion is just that, it's a draft. It doesn't have independent legal status. And this court emphasized that fact in the Southwest Center for Biological Diversity versus Bureau of Reclamation. And that was a case where, in an initial draft, Fish and Wildlife Service had found that if the level of Lake Mead were to rise, it would wipe out a bunch of willows, and unless you preserved those willows, you were going to have jeopardy to a gnat catch or a bird. It then, in its final, after talking more with the Bureau of Reclamation, it reversed course, said, no, we actually don't need to preserve the habitat there at the dam. We can do an alternative, which is to procure other habitat. And this court said that the agency is free to change its mind and can do so for a number of reasons. That the draft biological opinion really doesn't have sort of a legal status of its own, such that the agency has a heavy burden of justifying changes from the draft. But even if there were such a burden, I think the agency could fulfill it here, because the settlement agreement did represent a major change from the proposal that had been studied in the draft biological opinion. Because that biological opinion looked at the original proposal, which was load following at all three of these dams for the entire license term. And the settlement agreement, of course, changed that for the two particularly important dams. So that provides a rational basis for the difference in the final biological opinion, if we do have a burden of justification there. Unless there are. I don't think we have any further questions. Thank you for your argument. Thank you. Your Honors, I'll just make a couple of points. First of all, that Section 18 standing case is American Rivers v. FERC, a 1999 Ninth Circuit decision. And Section 18 prescriptions are fairly analogous to 10J. On the 10J question, 10J issues are not moved, as we pointed out on our brief, because they've not been withdrawn. And I might add that the snail plan specifically said it was only limited to addressing project impacts on snails, and it did not address sturgeon issues. So by this approach, when the snail plan is issued in six years, or I guess four years now, there will be nothing to come back to address those white sturgeon issues that were raised previously. And, in fact, the 10J issues go beyond the question of load following, because there was a whole host of 10J recommendations having to do with the content of the white sturgeon plan that FERC did not require Idaho Power to address. And, in fact, the sturgeon plan doesn't address. So those issues remain in place. And even if this Court were to find that the 10J issue is moot, the cost-benefit analysis is still very relevant here, because NEPA requires, regardless of what FERC ultimately decides, FERC is required under NEPA to do a full and accurate assessment of the environmental impacts of its decision-making. And since whether the project should be operated in run-of-river mode was one of the main issues here, FERC must conduct a full, fair, and accurate assessment of the impacts of run-of-river versus load-following operations. So the cost-benefit analysis is still very relevant, as well as under FERC's obligation to consider whether the license is in the public interest and give equal consideration to power and non-power values under the Federal Power Act. And I would also point out, with regard to the biological opinion, there was no new information that was submitted between the draft and the final biological opinion. As far as we know, that was indicated in the final biological opinion. The only difference was that Fish and Wildlife and Idaho Power got together, and Idaho Power said, we disagree. And, in fact, as far as Idaho Power's studies, both the draft and the final criticize Idaho Power's studies and say, they don't really tell us that much, they're not really dispositive. So it's not as if there's some new scientific information to justify the change, and particularly to justify Fish and Wildlife Service's sudden change in how it describes the science in the final. And I would point out, with regard to the proliferative snail particularly, that was a particularly arbitrary call, because you look at conflicts within the final biological opinion itself, where Fish and Wildlife says, in the beginning, you cannot rely on the spring populations alone for the survival and recovery of the species, because those populations are separately under threat from other activities. Yet, in their jeopardy analysis, they did just that, and relied on the existence of spring populations and said, it doesn't matter if the river populations get wiped out, because there will remain the spring populations. And that's just one example. There's many more examples where they either contradicted themselves within the final biological opinion or arbitrarily made changes in description of the science between the draft and the final. All right. Your time has expired, and this matter will stand submitted. Thank you both for your argument in this matter. It was helpful. I thought the arguments here were also good. You did very well. All right. This Court will stand in recess until tomorrow at 830. All rise. This Court is in recess until tomorrow at 830. Thank you. Thank you. Thank you.
judges: Thompson, Tashima, Callahan